(No. 45992.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. RONALD DEAN HOOD *et al.,* Appellants.

*Opinion filed November 27, 1974.*

Franklin S. Wallace of Winstein, Kavensky & Wallace, of Rock Island, for appellant Ronald Dean Hood.

Marshall E. Douglas of Jackson & Douglas, of East Moline, for appellant David Roseman.

William J. Scott, Attorney General, of Springfield, and David DeDoncker, State's Attorney, of Rock Island (James B. Zagel and Melbourne A. Noel, Jr., Assistant Attorneys General, of Chicago, and F. Stewart Meridian, Assistant State's Attorney, of counsel), for the People.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

Defendants Ronald Dean Hood and David Roseman were indicted for the crimes of rape, indecent liberties with a child, and aggravated assault. At the first trial in the circuit court of Rock Island County, the jury was unable to return a verdict. Following a subsequent jury trial, both defendants were convicted of rape and indecent liberties with a child, and defendant Hood was, additionally, convicted of aggravated assault. Both defendants were sentenced to terms of 8 to 25 years in the penitentiary for the crime of rape. The convictions were affirmed by the

appellate court, but each sentence was reduced to a term of 4 to 12 years. (*People v. Hood,* 11 Ill. App. 3d 329.) We granted leave to appeal. Defendants now assert that they were denied their right to a preliminary hearing, and that generally there was insufficient proof as a matter of law to sustain the convictions.

In the latter part of the evening of November 6, 1970, the 15-year-old victim of these crimes was returning to the apartment of a friend following a dance. As she was walking alone on the sidewalk, she was asked if she would like a ride by two young men in a car, later identified by her as the defendants. Though the men were unknown to her, they knew a friend of hers, and following a brief conversation and repeated invitations she accepted their offer. The victim was driven to a deserted road near an abandoned house. There the victim stated that she attempted to escape but was struck several times by Hood, and, following threats with a knife by him, she was forced into the back seat of the car where she was raped by both defendants. She was also forced to submit to an act of cunnilingus, which was the basis for the indecent liberties charge.

The men dropped the victim off a few houses away from her friend's apartment. She then ran to the apartment, where she was told through a closed door that her friend was not at home. As she turned to leave, a girl friend who had accompanied her earlier in the evening called to her from a vacant apartment downstairs where a few young people had gathered. The victim, disheveled and distraught, was questioned as to what had happened. She stated she was unable to tell them for fear her assailants would kill her. She then started to cry, became hysterical and unable to speak. After regaining some control, she informed them that she had been raped and related the events of the incident, describing both her assailants and the vehicle driven by them.

From the descriptions the victim gave of the assailants

and their car, it was suggested that one might be Hood. The victim explained that her parents and the police were not told of the crime until the following Monday, November 9, 1970, because she feared that if the police arrested only one assailant the other would kill her. During this interim, the victim was able to learn that Roseman could have been the remaining assailant. On Tuesday she made a photographic identification of Roseman and chose three pictures as resembling Hood, although she was unable to positively identify Hood because the pictures were old.

Defendants were arrested November 12, 1970, and arraigned the following day. The matter was continued until November 24 without mention in the record that a preliminary hearing was to be held. On November 19, defense counsel notified the State's Attorney that the defendants would appear November 24 for the purpose of a preliminary hearing. Defense counsel subpoenaed witnesses to testify at the hearing. On November 24 the State's Attorney appeared, but requested and received a continuance until December 10. Defense counsel protested the continuance and offered to prove that the witnesses subpoenaed were informed by the State's Attorney's office earlier that morning that the hearing was continued. Counsel argued that a preliminary hearing could be conducted that day because there was sufficient time and the docket was not extensive. He further argued that the continuance would place the date of the hearing beyond the date that the grand jury was scheduled to meet. It was asserted that the sole reason for the continuance was to delay the preliminary hearing until the grand jury would convene and indict the defendants, thereby depriving them of their right to such a hearing. While the record does not contain information concerning the term of the grand jury, we are advised that the parties do not dispute that the grand jury was not in session from November 14 to December 8, 1970.

Defendants moved for an immediate preliminary hearing on two separate occasions, November 27 and December 3, 1970, but the trial judge denied the motion. On December 10, 1970, the grand jury returned indictments against the defendants. No preliminary hearing was ever conducted. Defendants motioned on December 18, 1970, for a dismissal of the indictment for failure to conduct a preliminary hearing. The motion was denied.

During the trial the judge permitted two witnesses who were present in the downstairs apartment to testify that the victim told them she had been raped, but refused to allow them to relate the details of her statement. One of these witnesses testified that only two or three minutes passed during which they questioned the victim before she stated she had been raped. However, on cross-examination the victim responded affirmatively to defense counsel's specific question that she had been in the apartment 5 or 10 minutes before she explained what had happened.

No medical evidence was introduced at trial to support the victim's claim of having been raped. The victim testified on cross-examination that though she was a virgin prior to the attack there was no vaginal bleeding following the rape. However, one of the victim's girl friends who accompanied her home from the apartment and stayed the night with her testified that she saw the victim's underpants which were "stiff and everything." The underpants were not introduced in evidence at trial, nor were they examined by the police, since the victim had thrown them away the night following the assault.

Defendants called as a witness a laboratory analyst from the Illinois Bureau of Identification. He testified that he examined hairs taken from the vehicle identified by the victim as driven by defendants and found no comparison with hairs taken from the victim. He also found no blood or seminal stains on portions of the back seat which had been given to him for examination.

An alibi defense was proffered by each defendant to

the effect that they, their wives and another couple were at Roseman's house at the time the victim was attacked. In support of this defense Carlos Martinez testified that around 9 p.m. on November 6, he, Reuben Sierra and Robert Schild hitchhiked to Roseman's house to borrow Hood's car. Hood was not there when they arrived, but appeared shortly thereafter with Roseman. Hood gave them permission to use the car but told them to return it around midnight. The three teenagers then drove the car to Schild's house, where Terry Schild joined them. The four then drove around town in Hood's automobile. As they were driving they saw the victim walking alone and asked if she wanted a ride. She answered yes. Robert Schild and the victim were acquainted with each other from high school, and the victim apparently knew the other three teenage boys in the car. The victim sat in the back seat with Robert Schild while the other three sat in the front. They drove to a "parking" area on a deserted road where Robert Schild and the victim "made out." About an hour and a half later, the victim asked to be taken to a friend's apartment, and they dropped her off about one block from this location as she requested. The four teenagers then drove to Roseman's house where they returned the car to Hood. Martinez added that when they picked up the victim she looked as if she had been drinking. Martinez, however, was unable to remember where the car had been parked during the time that the victim "made out" with Robert Schild.

While Robert Schild had been subpoenaed as a defense witness, he appeared as a rebuttal witness for the State and repudiated his testimony given at the first trial which had been substantially similar to that given by Martinez. Schild now stated that on the evening of November 6 he and Reuben Sierra went to the same dance as did the victim, though he did not see her there or at any other time during that evening. He completely denied the veracity of Martinez' testimony.

The defense, in an apparent attempt to impeach this testimony, offered a transcript of Schild's prior testimony as well as a statement he had given to defense counsel. Schild, however, reasserted that his present testimony was true and that the possibility that he might be prosecuted for perjury induced him to tell the truth. Schild further testified that he had been offered a bribe of $1000 by Hood to testify as he did at the first trial. He stated that Martinez and Reuben Sierra were offered bribes of $300 each and that his brother, Terry, originally wanted nothing to do with it, but then agreed to go along. Although he knew that Hood had no money and no assets he said that he was told he and the others would be paid with the money Hood would receive from a false arrest lawsuit against the county following his acquittal.

Robert Schild admitted that a "slight threat" had been made to him by the State's Attorney. Apparently Schild had been charged with an auto theft, and when he was to appear in court the State's Attorney asked him if he would sign an affidavit admitting his perjury at the first trial. When Schild refused, the State's Attorney told him he would be in "a lot of trouble." Schild also stated his father, who "hated" Hood, had also indicated that he would tell where his son actually was the night of November 6, thereby exposing the perjury. The record indicates, however, that Schild's father had given conflicting stories to juvenile authorities as to where Schild supposedly was that evening.

Terry Schild was called by the State and testified that he had spent the evening of November 6 at his girlfriend's house and that he did not see the victim the entire evening. He further said that he had been offered a bribe by Hood. He explained that his earlier statement which he gave to defense counsel and which was favorable to the defendants was the result of a story made up by the four teenagers at meetings attended by Hood and, at times, by Roseman. He stated that his reason for now telling the truth was to help

his brother avoid the possibility of a perjury conviction.

Carlos Martinez and Reuben Sierra, Hood's brother-in-law, testified as surrebuttal witnesses. They denied that they had been offered bribes, and both maintained that the previous testimony of Martinez was correct.

Defendants assert that they were wilfully and intentionally deprived of the right to a preliminary hearing, which they equate to a constitutional right, and that the denial prejudiced their case by preventing them from learning of the existence of a possible defense witness. Defendants cite *Coleman v. Alabama,* 399 U.S. 1, 9, 26 L. Ed. 2d 387, 397, 90 S. Ct. 1999, and *People v. Adams,* 46 Ill.2d 200, 206, *aff'd,* 405 U.S. 278, 31 L. Ed. 2d 202, 92 S. Ct. 916, which held that a preliminary hearing was a "critical stage" of the prosecution so as to constitutionally require the presence of counsel to protect the rights of the defendants. They refer to *Adams* wherein this court quoted from *Coleman* the considerations which require the presence of counsel who " '*** may expose fatal weaknesses in the State's case, *** preserve testimony favorable to the accused of a witness who does not appear at trial [and] *** discover the case the State has against his client ***.' " (46 Ill.2d 200, 206.) Defendants argue that if an accused is entitled to appointment of counsel at a preliminary hearing for the considerations mentioned, then an accused who is able to retain counsel is entitled to have a preliminary hearing held for those same considerations.

Defendants' contention is without merit, for neither of the two cases cited will sustain their argument. These cases stand for the much narrower principle that if a preliminary hearing is held then an accused must be furnished counsel. In *Adams* we referred to the facts in *Coleman* and stated: "A preliminary hearing in Alabama, as in Illinois, has the purpose of determining whether there is probable cause to believe an offense has been committed by the defendant. [Citations.] In both States the hearing is not a required step in the process of prosecution, as the

prosecutor may seek an indictment directly from the grand jury, thereby eliminating the proceeding. (*Ex parte Campbell,* 278 Ala. 114, 176 So. 2d 242; Ill. Rev. Stat. 1969, ch. 38, par. 111—2.)" 46 Ill.2d 200, 205.

The statute cited in *Adams* and the law in effect at the time of defendants' indictments provided in pertinent part: "If the defendant is charged with the commission of a felony, and there is no waiver of prosecution by indictment with concurrence by the State, a preliminary hearing or examination upon the complaint or information shall be conducted *** unless the defendant waives such hearing or examination or unless a Bill of Indictment upon the same felony charge is returned in open court prior to such hearing or examination." Ill. Rev. Stat. 1969, ch. 38, par. 111—2.

In the present case the indictments were returned before a preliminary hearing could be conducted and before the effective date of section 7 of article I of the 1970 Constitution, which provides in part:

> "No person shall be held to answer for a crime punishable by death or by imprisonment in the penitentiary unless either the initial charge has been brought by indictment of a grand jury or the person has been given a prompt preliminary hearing to establish probable cause." (See *People v. Hendrix,* 54 Ill.2d 165.)

At the time the present indictments were returned, however, defendants had no constitutionally cognizable right to a preliminary hearing. (*People v. Camel,* 59 Ill.2d 422; *People v. Petruso,* 35 Ill.2d 578, 580.) Defendants cannot complain because the State's Attorney chose a procedure available under the law which eliminated the need for a preliminary hearing, and no error occurred in the failure to hold such a proceeding.

Defendants argue that the denial of a preliminary hearing prejudiced their case by preventing them from learning of the existence of a witness, identified as "Candy," who purportedly was the last person with the

victim prior to the rape. The testimony of certain witnesses indicated that "Candy" left the jurisdiction shortly after the indictments were returned against the defendants and neither they nor the State have learned any further information concerning her identity. Defendants maintain that since their defense was based on alibi and on allegations that the victim was intoxicated and emotionally upset when she left for the dance a few hours before the rape, this witness could have provided vital information favorable to their case. This argument, however, is based solely on supposition, and defendants cannot argue prejudice based on the absence of unknown testimony which might equally have been favorable to the State. (See *People v. Thomas,* 51 Ill.2d 39, 44.) Defendants, also, overlook the fact that the State never knew the witness's identity. Moreover, at that time the defendants had no constitutional right to have a preliminary hearing conducted, and they cannot complain of prejudice resulting from the absence of one.

It is to be noted, however, that our resolution of defendants' contentions relating to a preliminary hearing is not to be construed as condoning the tactics employed by the State's Attorney in this case. Under present constitutional safeguards appropriate sanctions might be considered in order to curtail similar methods if they are used in the future.

Defendants next maintain that there was insufficient proof as a matter of law to establish their guilt. They first argue there is no physical or medical evidence to support the charges. We find the contentions raised by defendants in support of their argument without merit. The appellate court effectively disposed of the contentions, and we agree with that court's determination that such matters were properly left to the jury's consideration.

Defendants further assert that the victim testified before the grand jury that she was assaulted with a gun, while at trial she testified that the weapon used was a

knife. They suggest that this discrepancy seriously negates her credibility. Defendants have failed to convincingly establish a basis for this contention. The record merely shows the indictment was amended to read "knife" rather than "gun," but it does not indicate that the original designation was the result of the victim's testimony or a typographical error, as maintained by the State.

During the direct examination of the victim at trial she was emotionally upset and crying. Defendants maintain that this "emotional display" prejudiced their case by causing an impassioned verdict. The record clearly indicates that the trial judge took every step possible to avoid such a result by calling recesses so that the victim might compose herself and by telling her to relax and quietly relate what had happened. Considering the age of the victim and her revulsion to the crimes of which she was the victim, we believe it is quite understandable that she would be emotionally upset in relating the details.

Defendants' assertion was raised in a motion for a mistrial following the victim's testimony, and in a motion for a new trial. Both were denied. The trial court was in a better position to evaluate any prejudice which might have arisen as a result of the victim's emotional condition, and it could better evaluate whether the victim was giving vent to her natural feelings or whether it was an attempt to influence the jury. The trial court rejected defendants' claim. After consideration of the record, we do not find that the trial court improperly disposed of defendants' contention.

It is argued by defendants that the victim made no fresh complaint of having been raped. Therefore, they maintain the trial court erred in admitting the hearsay testimony of the victim and of two witnesses who were present in the apartment as to the victim's statement that she had been raped. Fresh complaint or corroborative statement is an exception to the hearsay rule under which the victim of a rape or other witnesses to her statement

may testify to the fact of the victim's complaint, but not to the details thereof. The basis for its admission into evidence is that it is natural for the victim of a rape to complain of it and the fact that she did not would, in effect, be evidence that the crime had not occurred. *People v. Damen,* 28 Ill.2d 464, 472, 474.

Defendants cite as authority for their argument *People v. Taylor,* 48 Ill.2d 91. In *Taylor,* the 16-year-old complainant walked to a fire station where a fireman asked if he could help her. She responded that she wanted to use the telephone. In answer to his second question—whether something was wrong—she still did not indicate anything which could be deemed an uncontrolled and spontaneous utterance of outraged feelings which would qualify as a fresh complaint. (See *People v. Damen,* 28 Ill.2d 464, 472, 474.) It was only after she proceeded to the telephone and the fireman continued in his questioning that she told him she had been raped. We held that under the circumstances her statement was inadmissible as a spontaneous declaration or for its corroborative value. We opined that had the questions not been asked her statement would not have been made.

We find in the present case, however, that *People v. Damen,* 28 Ill.2d 464, is controlling. In *Damen,* the brutally assaulted victim had been raped in her own apartment. When the police arrived and noted the torn-up apartment and the bleeding victim they asked "What happened?" We held that her response was a spontaneous declaration and that under the circumstances the question asked did not destroy its spontaneity. In the present case, the circumstances surrounding the victim's statement must be viewed to determine if the statement so qualifies. Under the facts of the case, the 15-year-old victim ran to the apartment of a friend only to be told through a closed door that he was not at home. When she saw her other friends in another apartment and they asked what had happened she began to cry and answered that she could

not tell them for fear her attackers would kill her. She became hysterical and was unable to speak. After she regained some composure, she told them that she had been raped. Considering these circumstances, we find that the short period of time that had passed and the questions asked were not sufficient to destroy the spontaneous or unreflecting nature of her statement. The slight delay which occurred prior to the victim's complaint is adequately explained by her emotional condition. (*People v. Davis*, 10 Ill.2d 430, 436; *People v. Mason*, 301 Ill. 370, 378.) The trial court did not err in admitting the testimony relating to her fresh complaint.

A determination by the jury will not be set aside unless the evidence is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt as to the defendants' guilt. (*People v. McClindon*, 54 Ill.2d 546, 549; *People v. Anderson*, 48 Ill.2d 488, 500.) After reviewing the entire record, we find that the evidence presented was not so improbable as to raise a reasonable doubt of guilt.

Defendant Hood was convicted though he was not sentenced on the charge of aggravated assault. While it was not raised as an issue on appeal, we find that under our decision in *People v. Lilly*, 56 Ill.2d 493, 495, the conviction must be vacated. The conduct which was the basis for the aggravated-assault charge was also the conduct which provided an element of force in the rape charge and, as such, it cannot be the basis for a separate offense.

Accordingly, the judgment of the appellate court is affirmed and the cause is remanded to the circuit court of Rock Island County with directions to vacate Hood's conviction of aggravated assault.

*Affirmed and remanded, with directions.*